### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| SEAN COLLINS Derivatively on Behalf of UNITEDHEALTH GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW WITTY, STEPHEN HEMSLEY, BRIAN THOMPSON, CHARLES BAKER, TIMOTHY FLYNN, PAUL GARCIA, KRISTEN GIL, MICHELE HOOPER, F. WILLIAM MCNABB III, VALERIE MONTGOMERY RICE, JOHN NOSEWORTHY, and RICHARD T. BURKE, <br><br> Individual Defendants, <br> -and- <br><br> UNITEDHEALTH GROUP, Inc., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Sean Collins ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant UnitedHealth Group, Inc. ("**UnitedHealth**" or the "**Company**") submits this Verified Stockholder Derivative Complaint against individual defendants Andrew Witty, Stephen Hemsley, Brian Thompson, Charles Baker, Timothy Flynn, Paul Garcia, Kristen Gil, Michele Hooper, F. William McNabb III, Valerie Montgomery Rice, John Noseworthy, and Richard T. Burke (collectively, the "**Individual Defendants**") for their breaches of fiduciary duties as directors and/or officers of UnitedHealth, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are

1

based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant UnitedHealth against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein has caused substantial damage to UnitedHealth's reputation, goodwill, and standing in the business community and has exposed UnitedHealth to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged UnitedHealth in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by UnitedHealth's directors and officers from March 14, 2022, through the present (the "**Relevant Period**").

2.      UnitedHealth is a healthcare company that is made up of two businesses: Optum and UnitedHealthcare. UnitedHealthcare provides insurance to individuals, employers, and small businesses and is the largest insurance provider in the United States. Optum provides healthcare-related services, including software solutions, payment services, and data analytics.

3.      Optum is one of two leading companies in the health insurance market for first-pass claims editing. First-pass claims editing, which is used to process all claims that a health insurer receives, determines whether a particular claim should be paid or rejected. Another important component of U.S. health insurance markets are Electronic Data Interchange ("**EDI**") clearinghouses, which enable the transmission of claims, remittances, and other critical

information between payers and providers. Prior to the Relevant Period, UnitedHealth operated an EDI clearinghouse through Optum, with UnitedHealthcare as its largest customer.

4.      On January 6, 2021, UnitedHealth announced an agreement to acquire Change Healthcare ("**Change**") and integrate it into its existing Optum business. Change is a healthcare technology company that provides data solutions aimed at improving clinical decision making and simplifying payment processes across the healthcare system. Change provides the market leading product in claims editing, and also operated the largest EDI clearinghouse in the United States. As a result, Change has access to a significant amount of customer sensitive information ("**CSI**") and claims data. In addition, some of Change's customers grant "secondary-use rights" to this data, giving Change the right to use the data for purposes beyond providing EDI clearinghouse services.

5.      In response to the January 6th announcement, on February 24, 2022, the U.S. Department of Justice ("**DOJ**") filed a lawsuit challenging UnitedHealth's acquisition of Change. The DOJ alleged that the proposed acquisition would violate antitrust laws because the integration of Change and Optum would give UnitedHealth unparalleled access to information regarding nearly every health insurer, as well as health data on every single American. UnitedHealth assured the DOJ, investors, and customers that Optum would "maintain robust firewall processes" to prevent CSI from being shared between Optum and UnitedHealthcare.

6.      In May 2022, prior to the start of the antitrust trial, UnitedHealth created a new firewall policy for Optum and UnitedHealthcare, which addressed the sharing of CSI following the acquisition. This firewall policy was issued to specifically address the Change acquisition and designed to keep Optum and UnitedHealthcare data separate post-merger.

7.      In September 2022, the DOJ tried its antitrust lawsuit against UnitedHealth in the United States District Court for the District of Columbia. The court in the antitrust action ultimately

permitted the acquisition, repeatedly crediting UnitedHealth's firewall policy and commitment to preventing the sharing of data between UnitedHealthcare and Optum as the rationale for allowing the deal to proceed. In its decision, the court explained that UnitedHealth "has maintained a corporate antitrust firewall that expressly prohibits the sharing of CSI between business units" and found that the "widespread use of firewalls in the industry, United[Health]'s history of compliance with its own firewalls, the customer contracts, and the convincing testimony from senior executives about United[Health]'s practices and incentives-weighs strongly against the Government's position."

8.      Ultimately, on February 27, 2024, the *Wall Street Journal* reported that the DOJ had re-opened its antitrust investigation into UnitedHealth. In that article, the public learned for the first time that the DOJ was investigating the relationships between the Company's various segments, including Optum. As a result of this disclosure, the price of UnitedHealth stock declined by $27 per share, erasing nearly $25 billion in shareholder value.

9.      UnitedHealth was aware of the DOJ investigation since at least October 2023. Instead of disclosing this material investigation to investors or the public, however, UnitedHealth insiders sold more than $120 million of their personally held UnitedHealth shares. In the four months between learning about the DOJ investigation and the investigation becoming public, UnitedHealth's Chairman, Stephen Hemsley, reaped more than $102 million from the sale of UnitedHealth stock and Brian Thompson, the Chief Executive Officer ("**CEO**") of UnitedHealthcare, sold over $15 million worth of UnitedHealth stock.

10.     As detailed herein, and as alleged in the ongoing federal securities class action in the United States District Court, District of Minnesota styled *City of Hollywood Firefighters' Pension Fund v. UnitedHealth Group, Inc. et al.*, Case No. 0:24-cv-01743, (the "**Securities Class**

Action"), UnitedHealth's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) promulgated thereunder. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13.    Venue is proper in this District because the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

14.    Plaintiff Sean Collins is and has continuously been a stockholder of UnitedHealth during the wrongdoing complained of herein.

### Nominal Defendant

15.    Defendant UnitedHealth is a Delaware corporation with its principal executive offices located at 9900 Bren Road East, Minnetonka, Minnesota. UnitedHealth's shares trade on the New York Stock Exchange ("**NYSE**") under the ticker symbol "**UNH**."

### Individual Defendants

16. Defendant Andrew Witty ("**Witty**") has served as the Company's CEO and as a member of the Board since February 2021. He was previously President of UnitedHealth Group from November 2019 to February 2021, CEO of Optum from July 2018 to April 2021, and a

UnitedHealth Group director from August 2017 to March 2018. According to the Company's public filings, for the 2023 fiscal year, Defendant Witty received $23,534,936 in compensation from the Company. For the 2022 fiscal year, Defendant Witty received $20,865,106 in compensation. As of April 5, 2024, Defendant Witty beneficially owned approximately 292,888 shares of UnitedHealth common stock, worth $133,480,777.12.[1] During the Relevant Period, Defendant Witty sold over $11 million worth of UnitedHealth common stock on the basis of adverse material nonpublic information ("**MPNI**").

16.    Defendant Stephen Hemsley ("**Hemsley**") has served as non-executive Chair of the Board since November 2019. He previously served as Executive Chair of the Board from September 2017 to November 2019, CEO from November 2006 to August 2017, President from May 1999 to November 2014, and Chief Operating Officer ("**COO**") from November 1998 to November 2006. He joined the Company in 1997 and has been a Company director since 2000. According to the Company's public filings, for the 2023 fiscal year, Defendant Hemsley received $595,348 in compensation from the Company. For the 2022 fiscal year, Defendant Hemsley received $579,840 in compensation. As of April 5, 2024, Defendant Hemsley beneficially owned approximately 1,514,330 shares of UnitedHealth common stock, worth $690,140,754.20. During the Relevant Period, Defendant Hemsley sold over $155 million worth of UnitedHealth common stock on the basis of MNPI.

17.    Defendant Brian Thompson ("**Thompson**") has served as CEO of UnitedHealthcare since April 2021. He joined the Company in 2004 and has held various leadership positions in the Company. According to the Company's public filings, for the 2023 fiscal year, Defendant Thompson received $10,221,898 in compensation from the Company. For

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $455.74 per share closing price of UnitedHealth common stock on April 5, 2024.

the 2022 fiscal year, Defendant Thompson received $9,859,429 in compensation. As of April 5, 2024, Defendant Thompson beneficially owned 63,187 shares of UnitedHealth common stock, worth $28,796,843.38. During the Relevant Period, Defendant Thompson sold over $46.9 million worth of UnitedHealth common stock on MNPI.

18.     Defendant Charles Baker ("**Baker**") has served as a Company director since 2023. He is also a member of the Audit and Finance Committee and the Health and Clinical Practice Policies Committee. According to the Company's public filings, for the 2023 fiscal year, he received $59,327 in compensation from the Company. As of April 5, 2024, Defendant Baker beneficially owned 290 shares of UnitedHealth common stock, worth $132,164.60.

19.     Defendant Timothy Flynn ("**Flynn**") has served as a Company director since 2017. He is Chair of the Compensation and Human Resources Committee and is a member of the Governance Committee. According to the Company's public filings, for the 2023 fiscal year, he received $400,162 in compensation from the Company. As of April 5, 2024, Defendant Flynn beneficially owned 11,763 shares of UnitedHealth common stock, worth $5,360,869.62.

20.     Defendant Paul Garcia ("**Garcia**") has served as a Company director since 2021. He is also a member of the Audit and Finance Committee. According to the Company's public filings, for the 2023 fiscal year, he received $366,800 in compensation from the Company. As of April 5, 2024, Defendant Garcia beneficially owned 4,053 shares of UnitedHealth common stock, worth $1,847,114.22.

21.     Defendant Kristen Gil ("**Gil**") served as a Company director since 2022. She is also a member of the Audit and Finance Committee. According to the Company's public filings, for the 2023 fiscal year, she received $351,800 in compensation from the Company. As of April 5,

2024, Defendant Gil beneficially owned 1,036 shares of UnitedHealth common stock, worth $472,146.64.

22.    Defendant Michele Hooper ("**Hooper**") has served as a Company director since 2007. According to the Company's public filings, for the 2023 fiscal year, she $441,519 in compensation from the Company. As of April 5, 2024, Defendant Hooper beneficially owned 39,013 shares of UnitedHealth common stock, worth $17,779,784.62.

23.    Defendant F. William McNabb III ("**McNabb**") has served as a Company director since 2018. He is Chair of the Audit and Finance Committee and is a member of the Governance Committee. According to the Company's public filings, for the 2023 fiscal year, he received $392,883 in compensation from the Company. As of April 5, 2024, Defendant McNabb beneficially owned 12,812 shares of UnitedHealth common stock, worth $5,838,940.88.

24.    Defendant Valerie Montgomery Rice ("**Rice**") has served as a Company director since 2017. She is Chair of the Health and Clinical Practice Policies Committee and is a member of the Compensation and Human Resources Committee. According to the Company's public filings, for the 2023 fiscal year, she received $391,050 in compensation from the Company. As of April 5, 2024, Defendant McNabb beneficially owned 5,449 shares of UnitedHealth common stock, worth $2,483,327.26.

25.    Defendant John Noseworthy ("**Noseworthy**") has served as a Company director since 2019. He is Chair of the Governance Committee and is a member of both the Health and Clinical Practice Policies Committee and the Compensation and Human Resources Committee. According to the Company's public filings, for the 2023 fiscal year, he received $391,050 in compensation from the Company. As of April 5, 2024, Defendant Noseworthy beneficially owned 4,957 shares of UnitedHealth common stock, worth $2,259,103.18.

26.     Defendant Richard T. Burke ("**Burke**") served as a Company director from 1977 to 2022. He was the Lead Independent Director of the Company from September 2017 until 2022. He served as Chair of the Board from 2006 to August 2017, and was CEO of UnitedHealthcare, Inc., the Company's predecessor corporation, from 1977 until 1988. He also served as a member of the Nominating and Corporate Governance Committee of the Company. According to the Company's public filings, for the 2022 fiscal year, he received $172,512 in compensation from the Company. During the Relevant Period, Defendant Burke sold over $8.7 million worth of UnitedHealth common stock on MNPI.

27.     Andrew Witty, Stephen Hemsley, Brian Thompson, Charles Baker, Timothy Flynn, Paul Garcia, Kristen Gil, Michele Hooper, F. William McNabb III, Valerie Montgomery Rice, John Noseworthy, and Richard T. Burke may be referred to herein as the "**Individual Defendants**."

28.     The Individual Defendants, because of their positions with UnitedHealth, possessed the power and authority to control the contents of UnitedHealth's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases, alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to MNPI, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### The Individual Defendants' False and Misleading Statements

29.    On March 14, 2022, the first trading day after UnitedHealth filed its Answer to the allegations in the DOJ's antitrust complaint, UnitedHealth publicly "agreed to make binding commitments to its customers and the Government" to "maintain its robust firewall processes – and extend them to Change's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes."

30.    On March 17, 2022, the Company published on its website a document titled "Benefits of Combination with Change Healthcare," which addressed the DOJ's lawsuit and stated that "Optum will maintain robust firewall processes and extend them to Change Healthcare's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes." UnitedHealth also avowed that Optum "invests extraordinary time, money, and resources into safeguarding [CSI] and keeping it walled off from UnitedHealthcare" and that "UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer CSI."

31.    On April 5, 2022, UnitedHealth filed a press release with the SEC on Form 8-K. In the press release, the Company stated that the DOJ's lawsuit challenging the Change acquisition was "meritless."

32.    In May 2022 UnitedHealth adopted a new firewall policy relating to the proposed acquisition of Change. The policy explicitly addressed the sharing of customers' CSI between Optum and UnitedHealthcare and stated:

(a)    "The disclosure of External Customer CSI to [UnitedHealth] business units that are competitors of such External Customers is strictly prohibited";

(b)      "The use of External Customer to CEI to benefit [UnitedHealth] business units that are competitors of such External Customers is strictly prohibited";

(c)      UnitedHealth employees "may not access External Customer CSI unless such access is necessary to perform their job responsibilities";

(d)      "External Customer CSI shall be logically separated from other [UnitedHealth] business unit data within Electronic Data Sites"; and

(e)      "No employees of other [UnitedHealth] business units that are competitors of an External Customer shall have access to the location where External Customer CSI is stored within such Electronic Data Slides."

33.      On June 14, 2022, UnitedHealth published its annual Sustainability Report. In the report, the Company declared that it was "focused" on "maintaining data privacy and cybersecurity" and recognized its "obligation" to "protect the information of all those we serve." UnitedHealth continued to assert that it was "required to safeguard personal information reasonably and appropriately" and that the "[p]rimary tools used to fulfill these obligations are cybersecurity and data privacy programs."

34.      Further, the Sustainability Report explained that UnitedHealth "manages a robust Information Security Risk Management and Privacy Program that improves its ability to make risk-informed decisions by conducting systematic and structured reviews of information security risks." The results of these internal audits are then "communicated to executive leadership and presented to the Audit and Finance Committee of the Board of Directors quarterly."

35.      Similarly addressing the Company's data protection policies in the Sustainability Report, UnitedHealth explained that its "data protection policy applies to all lines of business and subsidiaries" and that its "Code of Conduct outlines our commitment to protecting the information

entrusted to us. Supported by a comprehensive set of principles, our policies and programs describe appropriate users of data and the safeguards that protect the confidentiality and integrity of our systems." These policies include "enterprise information security policies," "privacy and data protection policies," and "an incident management program that encompasses cybersecurity, privacy and compliance obligations."

36.    On November 29, 2022, UnitedHealth held its annual Investor Conference, materials for which were publicly released the prior day, on November 28. The Conference Book highlighted the Company's "long-established firewalls and strong legal, reputational, ethical and financial incentives to protect patient and customer information."

37.    On June 1, 2023, Defendant Witty represented UnitedHealth at the Bernstein Strategic Decisions Conference. During the conference, Defendant Witty acknowledged the Company's firewalls requirements, noting that UnitedHealth was focused on improving performance by "exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements [that] are needed there."

38.    Throughout the Relevant Period, UnitedHealth's Code of Conduct also stated that Optum's "provider businesses contract with competitors of UnitedHealthcare and may receive competitively-sensitive information, which must be protected, and sharing the data requested without review and approval by legal counsel should be a form of unfair competition."

39.    The statements above were materially false and misleading. UnitedHealth never established proper firewalls between Optum and UnitedHealthcare as required by its own policy, and as it told the court in the antitrust action, the DOJ, and investors it would do. Firewalls were never properly created for certain business applications. Despite assurances to the contrary, there

was never a meaningful technological separation between Optum and UnitedHealthcare that prevented the sharing of CSI.

**The Truth Emerges**

40.    On February 27, 2024, the *Wall Street Journal* reported that the DOJ had re-opened its antitrust investigation into UnitedHealth. In that article, the public learned for the first time that the DOJ was investigating the relationships between the Company's various segments, including Optum. As a result of these disclosures, the price of UnitedHealth declined by $27 per share.

**FIDUCIARY DUTIES**

41.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe UnitedHealth and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage UnitedHealth in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of UnitedHealth and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

42.    Each Individual Defendant owes and continues to owe UnitedHealth, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of UnitedHealth, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with UnitedHealth each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company the Individual Defendants had a duty to promptly disseminate accurate and

truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

44.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States pursuant to UnitedHealth's own Code of Conduct;

(c)     Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how UnitedHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of UnitedHealth, as well as procedures for reporting said reports

and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequately functioning system of internal legal, financial, and management controls such that UnitedHealth's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports of information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subject and duties set forth above; and

(i)     Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

45.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by UnitedHealth.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and of UnitedHealth and were at all times acting within the course and scope of such agency.

**Duties Pursuant to the Company's Code of Business Conduct**

47.    The Individual Defendants, as officers and/or directors of UnitedHealth, were bound by the Company's Code of Conduct: Our Principles of Ethics & Integrity[2] (the "**Code of Conduct**") which stated the following:

> Integrity purposefully leads the list. Integrity means we are reliably honest, fair, and morally responsible, always acting in the best interests of customers, consumers, and the communities where we live and work.
>
> How we conduct our work day-to-day is important to fulfilling our mission to help people live healthier lives and to help make the health system work better for everyone. Health care is among the most personal, intimate aspects of a person's life, and each individual must be able to trust our commitment to integrity it is the foundation for each of the five other values [Compassion, Inclusion, Relationships, Innovation and Performance] and everything we do at UnitedHealth Group.
>
> * * *
>
> We honor commitments. We never compromise ethics. We are known for living up to the highest standards of ethical behavior. We make honest commitments and consistently honor those commitments.
>
> We speak the truth. We deliver on our promises. We have the courage to acknowledge mistakes and do what is needed to address them

48.    The "Integrity" section of the Code of Conduct states the following:

> Every UnitedHealth Group employee, director, and contractor must act with integrity in everything we do. Acting with integrity begins with understanding and abiding by the laws, regulations, Company policies, and contractual obligations that apply to our roles in the Company, our work, and our mission. The UnitedHealth Group Board of Directors has adopted this global Code of Conduct, which applies to all employees, directors, and contractors, to provide

---

[2] *See* UnitedHealth Group, Inc.'s Code of Conduct: Our Principles of Ethics & Integrity (2023): https://www.unitedhealthgroup.com/content/dam/UHG/PDF/About/UNH-Code-of-Conduct.pdf.

guidelines for our decision-making and behavior. This Code is a core element of the Company's compliance program. Each section includes tools to help you understand your responsibilities and find answers to questions: an explanation of each subject addressed by the Code, key considerations, hypothetical challenges, resources, and links to applicable policies. Policies at the enterprise, business, and department levels provide more specific direction.

49.    The "Integrity" section of the Code of Conduct provides:

At UnitedHealth Group, we hold ourselves to the highest standards of personal and institutional integrity in our interactions with customers, members, patients, employees, health care professionals, partners, and other stakeholders, including governments and the public. We recognize that appearances matter when it comes to integrity.

50.    The "Integrity" section of the Code of Conduct states:

Do not use Company property, information, or your position for personal gain, or to compete with UnitedHealth Group.

Each of use has a duty to advance the Company's interests when an opportunity is presented. You may not use Company property, information, or your position with the Company to take advantage of corporate opportunities for your personal gain, unless the opportunity was first presented to and rejected by the Company, and you will not be competing with the Company's business activities.

Each director or employee involved in UnitedHealth Group's disclosure process is responsible for the accuracy and completeness of facts regarding the Company.

This includes representations to the Company's independent auditors, governmental regulators, and self-regulatory organizations. Directors and employees must review and critically analyze proposed disclosures or, where appropriate, delegate this task to others.

* * *

UnitedHealth Group is committed to the integrity of its records, books, and financial and other reporting. Employees are responsible for ensuring that all books, records, accounting, and reporting are accurate and complete, and properly reflect the actual transaction event recorded and are retained according to Company policy. In

addition, U.S. securities laws impose specific obligations on each
director or employee involved in the Company's financial disclosure
process, including the Senior Financial Officers. The Senior
Financial Officers and the individuals who assist them in the
disclosure processes must be familiar with and comply with all
controls and procedures that ensure that public reports and
documents filed with the U.S. Securities and Exchange Commission
meet the Company's obligations under U.S. securities laws and
rules.

51.     The "Accountability" section of the Code of Conduct states the following:

We are accountable for complying with all applicable laws,
regulations, and contractual obligations, with this Code of Conduct
and with the Company's policies and procedures. When we are
accountable, we earn the trust that our members, patients, providers,
and other business partners place in us.

We share the responsibility for preventing fraud, waste, and abuse
in the health care system. UnitedHealth Group has established
processes for identifying, reducing, and combating fraud, waste, and
abuse.

Prompt reporting of suspected Code or policy violations and
potentially illegal or unethical conduct to an appropriate Company
representative requires the courage to acknowledge our mistakes
and enables us to do whatever is needed to address them.

\* \* \*

UnitedHealth Group will take all reasonable precautions to
maintain the confidentiality of those who report an ethics or
compliance concern to the extent allowed by Company policy and
the law.

\* \* \*

Hold yourself accountable for your decisions and actions.

We must each take responsibility for preserving and enhancing
UnitedHealth Group's mission and goals. When we see potential
violations of law, regulations, this Code, Company policies,
contracts, or standards of conduct, we must report them.

Cooperate with all investigations, lawsuits, and other Company
legal matters.

You are expected to support the investigation of potential
violations of this Code, Company policies, and other Company
legal matters, including investigations and lawsuits. This includes
providing timely, accurate, truthful, and complete information and
documentation.

52.    The "Fair Competition and Fair Dealing" section of the Code of Conduct states the

following:

We seek competitive advantages only through legal and ethical
business practices. We succeed by outperforming our competitors
honestly and fairly.

* * *

Avoid discussions with competitors that may appear to restrain
competition unfairly.

Communications or agreements with competitors regarding rates,
prices, sales territories, provider reimbursement rates, employee
salaries or other terms of compensation, benefits, and other topics
related to UnitedHealth Group's businesses may violate applicable
competition laws, resulting in severe penalties against the Company
and, potentially, you. Although, there may be legitimate business
reasons to communicate with a competitor (for example, sometimes
competitors are also customers, and we frequently interact with
competitors at industry association meetings, educational industry
seminars, or conferences that cover issues common to the whole
industry), you should always make sure that your discussions in
these contexts do not cross into the areas of prohibited subjects or
activities.

* * *

Optum Health's provider businesses contract with competitors of
UnitedHealthcare and may receive competitively-sensitive
information, which must be protected, and sharing the data
requested without review and approval by legal counsel could be a
form of unfair competition.

19

53.     The "Privacy and Information Security" section of the Code of Conduct states the following:

>   Managing an individual's personal information respectfully, responsibly, and in accordance with all applicable laws builds trust individual-by-individual, serves our business objectives, and fosters enduring relationships with our stakeholders.
>
>   * * *
>
>   We are trusted and required to safeguard personal information reasonably and appropriately and to use or disclose such information only as authorized by the individual or in compliance with all applicable laws.

54.     The "Governmental Interactions" section of the Code of Conduct states the following:

>   All levels of government have enacted laws that define interactions with government officials and prohibit improper influence by private business in the government arena. Our compliance with these laws and regulations is crucial to upholding UnitedHealth Group's core values, advancing our mission, maintaining UnitedHealth Group's relationships in the public sector, and demonstrating that we are worthy of the public's trust.

55.     The "Communications and Marketing" section of the Code of Conduct states the following:

>   We must present information in a clear, truthful, and professional manner. Our business environment is incredibly dynamic, and our communications should positively reflect our commitment to make health care work for everyone.
>
>   Communicate Effectively and Appropriately
>
>   Because we work for a publicly-traded company, we must be aware of the securities laws' requirements concerning public disclosure of Company information. In short, you may not discuss any material nonpublic information including, financial information and reports, executive personnel changes, lawsuits or regulatory actions, and mergers or acquisitions outside of the Company unless you have received specific approval from the UnitedHealth Group chief legal

officer or Investor Relations, or are otherwise required to disclose such information.

* * *

We are committed to ethical marketing based upon transparency and honesty. We strive to ensure accuracy in our marketing and communications in support of our values and high standards of personal and institutional integrity.

Refer members of the media to Media Relations

A referral to Media Relations will ensure that the person or organization seeking information talks to a subject-matter expert and receives the most current information. All news releases for distribution to local, regional, or trade media must be review and approved by the appropriate business leader, the Communications Department, subject-matter experts, and assigned legal counsel before they are released.

* * *

Do not act as a Company spokesperson unless you have coordinated with the Communications Department.

Employees who are experts in a certain area or who are Company leaders may be asked to act as a media spokesperson. The appropriate staff will select and train employees for this role. All questions or requests from the media must be directed to Media Relations, and all spokespersons must coordinate their media contacts with their assigned communications staff. In the event of a Company-related crisis, UnitedHealth Group's Chief Communications Officer and media relations representatives from its businesses are authorized to talk with the media.

Only designated spokespersons may communicate on behalf of the Company with investors and analysts.

It is important that only those employees who have the required specialized knowledge speak to securities professionals, such as analysts, investors, broker dealers, investment advisors, and investment companies, on behalf of UnitedHealth Group, and all questions or requests from securities professionals must be directed to Investor Relations. This includes questions from analysts or others inquiring about our supplier or other business relationships.

56.     In the "Our Shared Responsibility" letter in the Code of Conduct states:

> UnitedHealth Group's Code of Conduct and our shared values of Integrity, Compassion, Inclusion, Relationships, Innovation and Performance form the foundation of our commitments to the millions of people we are privileged to serve. A commitment to compliance is an integral part of UnitedHealth Group's business strategy, culture and mission as it works to ensure the health care system works better for everyone – both now and in the future. The Code is foundational in our aim for excellence in all that we do and sets forth expectations for ethical behavior as we interact with our colleagues, members, patients, providers, and partners in our communities across the globe, helping us navigate the challenges of the rapidly changing world in which we work.

## Duties Pursuant to the Audit Committee Charter

57.     In addition to the duties set forth in the Code of Conduct, Defendants Baker, Garcia, Gill, and McNabb (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to UnitedHealth under the UnitedHealth Group Board of Directors Audit and Finance Committee Charter (the "**Audit Charter**").[3] Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

> The primary purpose of the Committee is (a) to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities relating to (i) the conduct and integrity of the Company's financial reporting to any governmental or regulatory body, the public or other users thereof, (ii) the Company's compliance with legal and regulatory requirements including privacy, cybersecurity and data protection, (iii) the efficacy of the Company's enterprise risk management structure and key processes, (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent outside auditor, and (v) the performance of the Company's General Auditor and internal audit function, and (b) to prepare the report of the Committee required by the Securities and Exchange Commission ("**SEC**") to be included in the Company's annual proxy statement.
>
> The Committee's job is one of oversight. The Company's

---

[3] *See* UnitedHealth Group Board of Directors Audit and Finance Committee Charter (November 7, 2023): https://www.unitedhealthgroup.com/content/dam/UHG/PDF/About/UNH-Audit-Committee-Charter.pdf.

> management is responsible for preparing the Company's financial statements and the independent outside auditor is responsible for auditing the annual financial statements and reviewing the quarterly financial statements. The Committee recognizes that financial management (including the General Auditor and internal auditing function), as well as the independent outside auditor, have more direct knowledge and detailed information about the Company than do Committee members. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent outside auditor's work.

58.    Under the "Responsibilities and Duties" section of the Audit Charter, a subsection titled "Documents/Reports Review" states:

> Meet to review and discuss with management and the independent outside auditor the Company's annual and quarterly financial statements, including reviewing the Company's specific disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations. Based on its discussions with management and the independent outside auditor, the Committee shall recommend to the Board of Directors whether the Company's annual financial statements should be included in the Company's Annual Report on Form 10-K (or the Annual Report to Shareholders).

> Review the Annual Report on Form 10-K prior to filing.

> Discuss with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. Discussion of earnings releases as well as financial information and earnings guidance may be done in a general manner (i.e., discussions of the types of information to be disclosed and the type of presentation to be made).

> Discuss significant findings and recommendations of the Company's independent outside auditor and the General Auditor and internal auditors, together with management's responses to those findings and recommendations.

> Review and discuss with the Company's Chief Executive Officer and Chief Financial Officer the procedures undertaken in connection with the Chief Executive Officer and Chief Financial Officer certifications for Forms 10-K and Forms 10-Q, including their

evaluation of the Company's disclosure controls and procedures and internal controls.

Prepare the Committee report required by SEC rules to be included in the Company's annual proxy statement.

59.     Under the "Responsibilities and Duties" section of the Audit Charter, a subsection titled "Internal Audit" states:

Review and approve the annual audit plans for the internal audit function and all material changes to such plans.

Review and concur in the appointment and termination of the General Auditor.

Review significant internal audit results, including any problems or difficulties, together with management's action plans.

Discuss regularly with the Company's General Auditor, the budget and staffing of the internal audit function, including responsibilities, organizational structure, auditor qualifications, and quality assurance reviews.

Review the qualifications, performance and objectivity of the internal audit function.

60.     Under the "Responsibilities and Duties" section of the Audit Charter, a subsection titled "Enterprise Risk Management" states:

Review with management, the Company's enterprise risk management framework, including the governance structure, the guidelines and policies for assessing, identifying, managing, monitoring and reporting of significant risks.

Meet periodically with management to review the Company's significant risks and the steps management has taken to monitor, control or mitigate such risks.

61.     Under the "Responsibilities and Duties" section of the Audit Charter, a subsection titled "Financial Reporting Processes" states:

In consultation with the Company's independent outside auditor, the General Auditor, and the internal auditors, consider the integrity of

the Company's financial reporting processes, both internal and external.

Discuss with management, the independent outside auditor, the General Auditor and the internal auditors, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent outside auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and (d) the type and presentation of information to be included in earnings press releases (paying particular attention to any use of non-GAAP financial measures permitted under SEC rules).

62.     Under the "Responsibilities and Duties" section of the Audit Charter, a subsection titled "Process Analysis and Review" states:

Establish regular and separate systems of reporting to the Committee by each of management, the General Auditor, and the independent outside auditor regarding any significant judgments, changes or improvements that have been made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

Discuss with the independent outside auditor, at least annually, any audit problems or difficulties and management's responses, any difficulties the auditor encountered during the course of the audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and any significant disagreements with management. The discussions with the independent outside auditor should address, to the extent applicable, any accounting adjustments that were noted or proposed by the independent outside auditor but were "passed" (as immaterial or otherwise), any communications between the audit team and its national office with respect to auditing or accounting issues presented by the engagement; and any "management" or "internal control" letter issued, or proposed to be issued, by the independent outside auditor to the Company.

Discuss, at least annually, with the independent outside auditor the matters required to be discussed by the applicable requirements of the PCAOB and the SEC.

Discuss any significant disagreement between management and the independent outside auditor in connection with the preparation of the financial statements, and resolve any disagreements between management and the independent outside auditor regarding financial reporting.

Inquire of the Company's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

63.    Under the "Responsibilities and Duties" section of the Audit Charter, a subsection titled "Other Activities" states:

Review with management the system the Company has in place to ensure that the Company's financial statements, reports, and other financial information disseminated to governmental organization and the public satisfy legal requirements.

Review and assess the effectiveness of the Company's policies, procedures and resource commitment in the areas of compliance, ethics, and privacy, by interacting with the leadership and management responsible for these functions.

Consider any tax issues, legal and regulatory matters or employee complaints or similar matters brought to the attention of the Committee that may have a material impact on the Company's financial statements or accounting policies.

Review and assess the effectiveness of the Company's policies, procedures and resource commitment in the areas of cybersecurity and data protection, including key risk areas and mitigation strategies.

Oversee and review the Company's artificial intelligence framework, including oversight of the Company's governance

mechanisms to monitor, identify and mitigate potential risks associated with the deployment of artificial intelligence.

Discuss and evaluate with management the Company's investment policy, including with respect to any ESG-related criteria.

Review, and as appropriate make recommendations to the Board regarding, financing policies and practices, including the issuance of debt, credit facilities and related activities.

Review with management the system and controls the Company has in place to ensure the accuracy of its key disclosures related to environmental, social and governance (ESG) matters.

Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

Report regularly to the Board on Committee actions and any significant issues considered by the Committee.

Oversee and review reports from the Chief Compliance and Ethics Officer regarding compliance with its Code of Business Conduct and Ethics and Principles of Ethics and Integrity.

Receive and review periodic reports regarding matters relating to the Company's compliance with legal and regulatory requirements from the Chief Compliance and Ethics Officer, who has express authority to communicate directly with the Committee as necessary.

Perform such other functions as assigned by law, the Company's Certificate of Incorporation or Bylaws, or the Board.

64.    While the Audit Committee had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

**The False and Misleading Proxy Statements**

65.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements filed on April 22, 2024, (the "**2024 Proxy**"), April 21, 2023 (the "**2023 Proxy**"), and April 22, 2022 (the "**2022 Proxy**"). The 2024 Proxy, 2023 Proxy, and 2022 Proxy are collectively referred to herein as the "**Proxies**."[4]

66.    The 2022 Proxy recommended that shareholders vote to elect Defendants Witty, Flynn, Garcia, Hemsley, Hooper, McNabb, Rice, and Noseworthy to serve until the annual meeting held in 2023. It also recommended that shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

67.    The 2023 Proxy recommended that shareholders vote to elect Defendants Witty, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, and Noseworthy to serve until the annual meeting held in 2024. It also recommended that shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2023.

68.    The 2024 Proxy recommended that shareholders vote to elect Defendants Witty, Baker, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, and Noseworthy to serve until the annual meeting held in 2025. It also recommended that shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024.

---

[4] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

69.     The 2022 Proxy stated the following regarding the Board's role in risk oversight at

the Company:

> Our Board oversees management's enterprise-wide risk management activities and ensuring that risk matters are appropriately brought to the Board and/or its committees for review. Risk management activities include assessing and taking actions necessary to manage risk incurred in connection with the long-term strategic direction and operation of our business. Our enterprise-wide risk management program has a strong partnership with senior business leaders, who actively drive key risk identification and estimates. We maintain robust internal processes to identify key short-term, intermediate, and long-term risks and document underlying risk drivers, focusing management's risk assessment and mitigation activities against those drivers. Risk drivers are evaluated based on their immediacy, the industry to which they are specific and the nature of the risk. Both the Principles of Governance and the Board's leadership structure facilitate our Board's oversight of risk and communication with management regarding these activities.
>
> Each director on our Board is required to have risk oversight ability for each skill and attribute the director possesses as reflected in the collective skills section of our director skills matrix described on page 9 [of the 2022 Proxy]. Each of our Board's committees is responsible for oversight of risk management practices for categories of risks relevant to their functions.
>
> * * *
>
> Our Board oversees the work of its various committees by receiving regular reports from the Committee Chairs regarding their work. In addition, discussions about the Company's culture, strategic plan, consolidated and segment business results, capital structure, merger and acquisition-related activities and other business discussed with the Board include a discussion of the risks associated with the particular item under consideration. Our Board and Board committees also have authority to retain independent advisers. Our Board's and committee's respective processes for managing cybersecurity risk oversight, artificial intelligence oversight, quality and patient safety oversight and incentive compensation risk are set forth below.

70.     The 2022 Proxy also stated the following regarding the Company's Code of

Conduct: Our Principles of Ethics & Integrity:

The Company's Code of Conduct (Code), adopted by the UnitedHealth Group Board of Directors, sets expectations for ethical conduct across our company, including but not limited to, integrity, accountability, fair competition and fair dealing, privacy and information security, our assets and the environment, government interactions, communications and marketing and a safe and supportive work environment. The Code also describes the process to report potential misconduct, whistleblower protections, non-retaliation policies and the repercussions for violation of the Code (including termination and possible legal action). The Code is available on the Company's website.

Any waiver of the Code for the Company's executive officers, senior financial officers or directors may be made only by the Board or a committee of the Board. We will publish any amendments to the Code, as well as any waivers of the Code for an executive officer or director, on our website. Our entire global workforce, including applicable contractors and part-time employees, receives periodic training on our Code and other ethical standards.

71.    The 2023 Proxy stated the following regarding the Company's Code of Conduct:

Our Principles of Ethics & Integrity:

Our Board adopts and oversees enforcement of the Company's Code of Conduct (Code), which defines responsibilities, accountabilities and reporting lines related to business conduct, conflicts of interest, public disclosure practices, compliance obligations, and other areas. The Code also describes the process to report potential misconduct, whistleblower protections, non-retaliation policies and the repercussions for violation of the Code (including termination and possible legal action). The Code is available on the Company's website.

Any waiver of the Code for the Company's executive officers, senior financial officers or directors may be made only by the Board or a committee of the Board. We will publish any amendments to the Code and waivers of the Code for an executive officer or director on our website. Our entire global workforce, including applicable contractors and part-time employees, receives periodic training on our Code and other ethical standards.

72.    The 2024 Proxy stated the following regarding the Company's Code of Conduct:

Our Principles of Ethics & Integrity:

Our Board adopts and oversees enforcement of the Company's Global Code of Conduct (Code). Foundational to the Company's compliance and ethics program and subject to periodic ethical risk assessments, our Code defines responsibilities, accountabilities and reporting lines related to business conduct, conflicts of interest, public disclosure practices, legal compliance obligations, and other areas. The Code also describes misconduct reporting and whistleblower legal protections, reporting confidentiality and helpline contact information, violation actions (including termination and possible legal action), non-retaliation principles, fair dealing, and the protection and proper use of personal information and Company assets. The Code is available on the Company's website.

Any waiver of the Code for the Company's executive officers, senior financial officers or directors may be made only by the Board or a committee of the Board. We will publish any amendments to the Code and waivers of the Code for an executive officer or director on our website. Our entire global workforce, including independent contractors and part-time employees, receives periodic training on our Code and other ethical standards.

73. The 2023 Proxy and 2024 Proxy contained similar provisions to the 2022 Proxy regarding risk oversight and the Audit Committee's role in risk assessment and risk management.

74. Defendants Witty, Baker, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, and Noseworthy caused the Proxies to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the Proxies claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences.

75. Defendants Witty, Baker, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, and Noseworthy caused the Proxies to be false and misleading and failed to disclose material facts necessary to make the statement therein not false and misleading. Specifically, the Proxies failed

to disclose, *inter alia*, that: UnitedHealth never established proper firewalls between Optum and UnitedHealthcare as required by its own policy, and as it told the court in the antitrust action, the DOJ, and investors it would do. Firewalls were never properly created for certain business applications. Despite assurances to the contrary, there was never a meaningful technological separation between Optum and UnitedHealthcare that prevented the sharing of CSI. As a result, Defendants' public statements were materially false and misleading at all relevant times.

76.   As a result of the Company's false and misleading statements in the Proxies, the Company's stockholders made uninformed decisions when voting to reelect the Individual Defendants as proposed in the Proxies.

## BREACHES OF DUTIES

77.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of UnitedHealth, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

78.   The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the establishment of proper firewalls between Optum and UnitedHealthcare as required by its own policy, as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused UnitedHealth substantial damage.

79.   The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper

statements detailed herein, and failing to properly oversee UnitedHealth's public statements and internal control functions.

80.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of UnitedHealth, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, UnitedHealth has expended, and will continue to expend, significant sums of money.

## DAMAGES TO UNITEDHEALTH

81.     As a direct and proximate result of the Individual Defendants' conduct, UnitedHealth has expended and will continue to expend significant sums of money.

82.     Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action of amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

83.     As a direct result of the Individual Defendants' conduct, UnitedHealth has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.     Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

85.    Plaintiff brings this action derivatively and for the benefit of UnitedHealth to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of UnitedHealth, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

86.    UnitedHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

87.    Plaintiff is, and has been continuously at all relevant times, a stockholder of UnitedHealth. Plaintiff will adequately and fairly represent the interests of UnitedHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

88.    A pre-suit demand on the Board of UnitedHealth is futile and, therefore, excused. At the time of filing this action, the Board consists of Individual Defendants (i) Witty, (ii) Hemsley, (iii) Baker, (iv) Flynn, (v) Garcia, (vi) Gil, (vii) Hooper, (viii) McNabb, (ix) Rice, and (x) Noseworthy (the "**Demand Defendants**"). Plaintiff needs only to allege demand futility as to a majority of the Directors who are on the Board at the time this action is commenced.

89.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Board faces a substantial likelihood of personal liability and is therefore incapable of making and independent and disinterested decision to bring the claims herein.

90.    Demand is excused as to all of the Demand Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements regarding the establishment of proper firewalls between Optum and

UnitedHealthcare as required by its own policy. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Demand Defendants breached their fiduciary duties, face a substantial likelihood liability and are not disinterested. Demand upon them is futile and thus excused.

91.     Defendant Witty and the Audit Committee Defendants solicited the Proxies. The Proxies were false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

### A.  The Board Faces a Substantial Likelihood of Liability

92.     Demand is excused as to all of the Demand Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability. In complete abdication of their fiduciary duties, the Demand Defendants either knowingly or recklessly participated in making and/or causing the Company to make materially false and misleading statements regarding the establishment of proper firewalls between Optum and UnitedHealthcare as required by its own policy. Specifically, the Demand Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospects from the investing public and supporting the artificially inflated price of UnitedHealth's securities. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Demand Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile, and thus excused.

93.     The Demand Defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

CASE 0:24-cv-03484-JMB-DTS    Doc. 1    Filed 08/29/24    Page 36 of 49

94.     Additionally, the Demand Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

95.     The Demand Defendants, as members of the Board, were and are subject to UnitedHealth's Code of Conduct. The Demand Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Demand Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

**Additional Demand Futility Allegations**

96.     Demand is further excused as to Defendant Witty. Defendant Witty served as the Company's Chief Executive Officer and member of its Board of Directors since February 2021. As an employee of the Company, Defendant Witty derives substantially all of his income from his employment with the Company as stated above. Accordingly, Defendant Witty could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis.

97.     Moreover, as CEO, Defendant Witty had the power and authority to control the contents of the Company's financial filings, press releases, and other market communications. He attested to being involved in the preparation and delivery of the Company's SEC filings alleged herein to be misleading and had the ability to have them corrected and/or prevent their release. Defendant Witty knew or recklessly disregarded the adverse facts regarding the establishment of

36

proper firewalls between Optum and UnitedHealthcare had not been disclosed to, and were being hidden from, the public. Defendant Witty also engaged in insider trading, selling over 21,500 shares of artificially inflated Company common stock for personal profits of more than $11 million. Furthermore, Defendant Witty is also a defendant in the Securities Class Action. As a result, Defendant Witty faces a substantial likelihood of liability, would not be disinterested in a demand regarding his own wrongdoing, and demand is futile and excused as to him.

98.    Demand is further excused as to Defendant Hemsley. Defendant Hemsley served as a Company director since November 2019. The Company provides Defendant Hemsley with significant compensation for his role as stated above. As such, Defendant Hemsley cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Hemsley render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. Defendant Hemsley also engaged in insider trading, selling approximately 286,900 shares of artificially inflated Company common stock for proceeds of over $155 million. As a result, Defendant Hemsley breached his fiduciary duties, received a material personal benefit from the wrongdoing alleged herein, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Hemsley is futile and excused.

99.    Demand is further excused as to Defendant Baker. Defendant Baker served as a Company director since 2023. He is also a member of the Audit and Finance Committee. The Company provides Defendant Baker with significant compensation for his role as stated above.

As such, Defendant Baker cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Baker render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Baker breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Baker is futile and excused.

100.    Demand is further excused as to Defendant Flynn. Defendant Flynn served as a Company director since 2017. The Company provides Defendant Flynn with significant compensation for his role as stated above. As such, Defendant Flynn cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Flynn render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Flynn breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Flynn is futile and excused.

101.    Demand is further excused as to Defendant Garcia. Defendant Garcia served as a Company director since 2021. He is also a member of the Audit and Finance Committee. The Company provides Defendant Garcia with significant compensation for his role as stated above.

As such, Defendant Garcia cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Garcia render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Garcia breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Garcia is futile and excused.

102.    Demand is further excused as to Defendant Gil. Defendant Gil served as a Company director since 2022. She is also a member of the Audit and Finance Committee. Defendant Kristen Gil ("Gil") served as a Company director since 2022. She is also a member of the Audit and Finance Committee. The Company provides Defendant Gil with significant compensation for her role as stated above. As such, Defendant Gil cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Gil render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further as a trusted Company director she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Gil breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Gil is excused.

103.    Demand is further excused as to Defendant Hooper. Defendant Hooper served as a Company director since 2007. The Company provides Defendant Hooper with significant compensation for her role as stated above. As such, Defendant Hooper cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Hooper render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further as a trusted Company director she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Hooper breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Hooper is excused.

104.    Demand is further excused as to Defendant McNabb. Defendant McNabb served as a Company director since 2018. He is also Chair of the Audit and Finance Committee. The Company provides Defendant McNabb with significant compensation for his role as stated above. As such, Defendant McNabb cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant McNabb render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant McNabb breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant McNabb is futile and excused.

105.    Demand is further excused as to Defendant Rice. Defendant Rice served as a Company director since 2017. The Company provides Defendant Rice with significant compensation for her role as stated above. As such, Defendant Rice cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Rice render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further as a trusted Company director she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Rice breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Rice is excused.

106.    Demand is further excused as to Defendant Noseworthy. Defendant Noseworthy served as a Company director since 2019. The Company provides Defendant Noseworthy with significant compensation for his role as stated above. As such, Defendant Noseworthy cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Noseworthy render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Noseworthy breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Noseworthy is futile and excused.

41

107.    Furthermore, Defendants Baker, Garcia, Gil, and McNabb have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of UnitedHealth's financial statements. Specifically, the Audit Charter provides that the Audit Committee is responsible for:

> The primary purpose of the Committee is (a) to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities relating to (i) the conduct and integrity of the Company's financial reporting to any governmental or regulatory body, the public or other users thereof, (ii) the Company's compliance with legal and regulatory requirements including privacy, cybersecurity and data protection, (iii) the efficacy of the Company's enterprise risk management structure and key processes, (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent outside auditor, and (v) the performance of the Company's General Auditor and internal audit function, and (b) to prepare the report of the Committee required by the Securities and Exchange Commission ("SEC") to be included in the Company's annual proxy statement.
>
> The Committee's job is one of oversight. The Company's management is responsible for preparing the Company's financial statements and the independent outside auditor is responsible for auditing the annual financial statements and reviewing the quarterly financial statements. The Committee recognizes that financial management (including the General Auditor and internal auditing function), as well as the independent outside auditor, have more direct knowledge and detailed information about the Company than do Committee members. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent outside auditor's work.

108.    In their capacities as Audit Committee members, Defendants Baker, Garcia, Gil, and McNabb reviewed and approved materially misleading statements and allowed them to be disseminated in UnitedHealth's SEC filing and other disclosures. Thus, Defendants Baker, Garcia, Gil, and McNabb breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

109.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

110.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

111.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

112.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

113.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

114.    The false and misleading elements of the annual Proxies led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to UnitedHealth.

115.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

116.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

117.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

118.    The Individual Defendants, by virtue of their positions with UnitedHealth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of UnitedHealth and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause UnitedHealth to engage in the illegal conduct and practices complained of herein.

119.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

120.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

121.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UnitedHealth's business and affairs as directors and/or officers of the Company.

122.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

123.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly and recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

124.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

125.    The Individual Defendants engaged in a sustained and a systemic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UnitedHealth has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities litigation, severe damage to the share price of the Company's stock, and an increased cost of capital. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

127.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

128.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of UnitedHealth.

130.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from UnitedHealth tied to the performance or artificially inflated valuation of UnitedHealth, or received compensation that was unjust in light of the Individual

Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

131.    Plaintiff, as a stockholder and a representative of UnitedHealth, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

132.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of UnitedHealth and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.    Determining and awarding to UnitedHealth the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing UnitedHealth and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect UnitedHealth and its stockholders from a repeat of the damaging events described herein;

E.    Awarding UnitedHealth restitution from Individual Defendants;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

Dated:  August 29, 2024                    **REINHARDT WENDORF & BLANCHFIELD**

                                           */s/Garrett D. Blanchfield*
                                           Garrett D. Blanchfield (#209855)
                                           Brant D. Penney (#316878)
                                           Roberta A. Yard (#322295)
                                           80 South 8th Street, Suite 900
                                           T: (651) 287-2100
                                           g.blanchfield@rwblawfirm.com
                                           b.penney@rwblawfirm.com
                                           r.yard@rwblawfirm.com

                                           **LEVI & KORSINSKY, LLP**
                                           Gregory M. Nespole (*pro hac vice* forthcoming)
                                           Daniel Tepper (*pro hac vice* forthcoming)
                                           Correy A. Suk (*pro hac vice* forthcoming)
                                           Sidharth Kakkar (*pro hac vice* forthcoming)
                                           33 Whitehall Street, 17th Floor
                                           New York, NY 10004
                                           T. 212.363.7500
                                           F. 212.363.7171
                                           gnespole@zlk.com
                                           dtepper@zlk.com
                                           csuk@zlk.com
                                           skakkar@zlk.com

                                           *Counsel for Plaintiff*

## **VERIFICATION**

I, Sean Collins, under penalty of perjury, hereby declare that I am a plaintiff in the foregoing Verified Stockholder Derivative Complaint (the "Complaint") that I have read the Complaint, and that the facts therein are true to my own knowledge, except as to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Date:   August 28 , 2024

_____

Sean Collins